UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANNON M. BLICK,

Plaintiff,

v.

ANN ARBOR PUBLIC SCHOOL DISTRICT,
ANN ARBOR BOARD OF EDUCATION,
SHONTA A. LANGFORD, DAWN LINDEN,
DAVID A. COMSA, JEANICE KERR
SWIFT, TANEIA GILES, and MIKE
MADISON,

Defendants.

_____/

Case No. 19-cv-12127

U.S. District Court Judge
Gershwin A. Drain

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 61)

### I.   INTRODUCTION

On July 20, 2019, Plaintiff Shannon M. Blick initiated this civil rights and employment discrimination action against Defendants Ann Arbor Public School District ("AAPSD" or "District") and Ann Arbor Board of Education ("AABOE"), as well as Defendants Shonta A. Langford, Dawn Linden, David A. Comsa, Jeanice Kerr Swift, Taneia Giles, and Mike Madison (collectively "Individual

1

Defendants").[1]  *See* ECF No. 1.  Plaintiff filed her Amended Complaint on October 22, 2019 alleging that Defendants falsely accused her of committing fraud and misconduct before they involuntarily placed her on paid administrative leave, and thus constructively terminated her.  *See* ECF No. 14.

 Presently before the Court is Defendants' Motion for Summary Judgment, filed on December 5, 2022.  *See* ECF No. 61.  Plaintiff filed a timely response, *see* ECF No. 64, and Defendants replied, *see* ECF No. 67.  The Court held a hearing on this matter on April 20, 2023.  For the following reasons the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (ECF No. 61).  Specifically, the Court **GRANTS** summary judgment with respect to Plaintiff's freedom of speech claims (Count II) and her freedom of associations claim(s) (Count IV) but **DENIES** Defendants' request for attorney fees.

## II.   BACKGROUND

### A. Factual Background

#### 1.  Blick's hiring and duties

Blick began her employment with the AAPSD and AABOE as the principal of Lawton Elementary School ("Lawton") in September 2013.  ECF No. 61-5,

---

[1] On October 20, 2021, Judge Dawkins Davis entered a stipulated order, *inter alia*, dismissing Defendants Comsa and Giles with prejudice.  ECF No. 36.

PageID.1307.  She held that position until she was placed on administrative leave on April 26, 2019.  *See* ECF No. 64-2, PageID.1898.   During her time as principal of Lawton, Blick was a member of the Ann Arbor Administrator Association union ("Union").  ECF No. 61-5, PageID.1308.

With respect to Lawton's budget, Blick described her responsibilities as folllows: "determining how to allocate funds," "monitor[ing] what is being spent and how much money is left," and "ensur[ing] that money is spent appropriately." ECF No. 61-5, PageID.1307.   Additionally, beginning in August 2018, Robin Brown, Blick's office professional, could no longer submit timesheets for processing without Blick's approval.  No. 61-5, PageID.1313–14; ECF No. 61-7, PageID.1453.

### 2.  Blick recommends a contract custodian for concurrent work as a lunch period supervisor

Willie Johnson began working at Lawton as a subcontracted custodian through ABM in 2014.  ECF No. 61-5, PageID.1308; ECF No. 61-7, PageID.1399. Blick described her relationship with Johnson as "friendly," ECF No. 61-5, PageID.1316, and she stated that her "husband saw Mr. Johnson as family."  ECF No. 61-9, PageID.1553.   There are some allegations—reports from Michael Williams, Johnson's ABM supervisor, to Shonta Langford, AAPSD Executive Director of Human Resources—that Blick and Johnson had a romantic relationship that caused Blick to show Johnson favoritism.  *See* ECF No. 61-7, PageID.1399;

3

ECF No. 61-16, PageID.1654.  However, Blick denies they had an affair.  *See* ECF

No. 61-5, PageID.1325; ECF No. 61-16, PageID.1652.

Blick testified that, in an effort to hire and retain more lunch hour staff, Dawn

Linden, AAPSD's Executive Director for Elementary Education and then Assistant

Superintendent of Teaching and Learning, approved a plan for elementary school

principals to hire any person working in the school in a different capacity as a lunch

period supervisor ("LPS") and to permit LPS's to work additional hours in the

school.  ECF No. 61-5, PageID.1310–11; ECF No. 61-8, PageID.1465.  Blick thus

recommended that Johnson be hired as an LPS, a position she expected him to work

during his fifty-minute lunch break from his custodial duties.  *Id.* at PageID.1311–

13.  Langford testified that no other AAPSD principal employed a custodian as an

LPS.  ECF No. 61-7, PageID.1388, 1453.

### 3.  Discovery that Johnson was being paid for concurrent work

Blick testified that she and Brown were unable to access and review Lawton's

lunch hour account until February 2019 due to technical issues.  ECF No. 61-5,

PageID.1309.  Thus, when they gained access, they discovered "multiple issues with

the payroll department and the finance department," including an employee who had

worked during the previous summer and was still being paid out of the lunch hour

account.  *Id*.  After accessing the system, Brown observed that the lunch hour

account was nearly depleted and emailed Blick and Tenia Giles, Lawton's Assistant

4

Principal, about the problem on February 20, 2019. *Id.*; *id.* at PageID.1314. Brown informed Blick and Giles that Johnson had been reporting that he had been working four hours per day as an LPS on his weekly timesheet. *Id.* at PageID.1310. Giles advised Blick that she wanted to alert Linden, their supervisor, about the issue. *Id.* at PageID.1318. Blick agreed that the problem should be reported, but she testified that she wanted to report to Linden along with Giles because there "was a history of [] Giles making claims against [Blick] that school year." *Id.* Giles reported to Linden, without Blick, that the budget was depleted and that there was a concern that Johnson was being paid for concurrent work as an LPS and as a custodian. ECF No. 61-7, PageID.1399.

### 4. Initial AAPSD Investigation

Linden relayed the information to Langford, and they began an investigation. They interviewed Blick; Giles; Johnson; Brown; Dante Watson, Lawton's former assistant principal, and Williams in late February 2019.[2] *See* ECF No. 61-16.

During her interview, Blick explained that she did not review Johnson's timesheets before singing them and thus did not notice that he was claiming

---

[2] The Court notes that there is some ambiguity in the record as to when Linden and Langford interviewed Williams: the interview notes are dated May 7, 2019, ECF No. 61-16, PageID.1654, but Langford and Linden both remember their conversation with Williams happening amid the other interviews that occurred in February 2019, *see* ECF No. 61-7, PageID.1400; ECF No. 61-8, PageID.1517.

excessive time.  ECF No. 61-16, PageID.1657–58.  This is consistent with her later deposition testimony.  *See* ECF No. 61-5, PageID.1314, 1373.  However, when Linden and Langford interviewed Brown, she reported that she "told [Blick] that [Johnson] was getting paid for time that he shouldn't be" during the 2015–2016 school year, but Blick basically told her to "leave it alone."  ECF No. 61-13, PageID.1636.  Brown speculated that Blick did not correct the issue when Brown first raised it because Blick and Johnson were "friends," so Johnson "had it made." ECF No. 61-16, PageID.1661.  Likewise, Giles testified that she informed Langford that Williams told her that Blick and Johnson were in a relationship.  ECF No. 61-2, PageID.1271, 1273.    Additionally, when Langford and Linden interviewed Williams, he reported that Blick showed Johnson "favoritism" and that Johnson had told him that "[Johnson] was sleeping with [Blick]."  ECF No. 61-16, PageID.1654; ECF No. 61-7, PageID.1399.

Blick's testimony at her deposition confirmed that Brown had informed her that Johnson was claiming too many hours prior to February 2019, but she indicated that Brown included these complaints with several issues regarding other lunch hour staff.  ECF No. 61-5, PageID.1310, 1313. Notably, when Johnson was interviewed during the AAPSD investigation, he reported that he and Blick had discussed him working three and a half hours per day between supervising the lunch period and the

6

morning period when parents are dropping their students off.  ECF No. 61-16, PageID.1662, 1669.

### 5.  Blick is placed on administrative leave

Linden and Langford decided to place Blick on paid administrative leave while the investigation was pending due to the amount of money Johnson had acquired and Blick's failure to monitor the Lawton budget.  ECF No. 61-7, PageID.1391, 1405.  While they advised Swift of, and she agreed with, their decision to place Blick on leave, Swift's approval was not required.  *Id.* at PageID.1391–92. Langford testified that they placed Blick on administrative leave as part of the normal "process and procedure" when investigating someone for misconduct, such as for "theft or fraud," "to protect the individual and investigation."  *Id.* at PageID.1392.  During her deposition, Blick agreed that she did not think it was "appropriate for somebody [under investigation] to have [a] conversation that would influence a witness."  ECF No. 61-5, PageID.1359.

Langford and Linden met with Blick and her Union Vice President, Jason Skiba, on April 26, 2019 to hand-deliver a letter informing Blick that she was being placed on leave.  ECF No. 61-8, PageID.1484; ECF No. 61-20.  The letter provided, in relevant part:

> [Y]ou are being placed on an administrative paid leave of absence effective immediately, pending an investigation of allegations of potential fraud and misconduct.

7

In the meantime, you are directed not to contact any students, parents or staff regarding this matter.

. . . [Y]ou are also directed not to enter onto District buildings or property, with the exception of matters that involve your children (ie. Transporting to/from school and special events) . . . .

Should you have any questions please do not hesitate to contact me directly.

*Id.* at PageID.1697.   Linden testified that she explained to Blick that "being on administrative leave mean[t] that [Blick] no longer function[ed] as the principal of Lawton, so should not communicate about things regarding her principal role, or engage in decision making, or work-related functions."   ECF No. 61-8, PageID.1484–85.   Thus, Linden told Blick that "she could not communicate [with the Lawton Community] in her capacity as a principal or about matters related to this [investigation]."  *Id.* at PageID.1486.  Linden told Blick that she could, however, still participate as a parent of three children who were enrolled at Lawton at the time. *Id*.   Likewise, Swift testified that it is AAPSD policy that "[i]ndividuals on administrative leave are able to participate as parents and citizens." ECF No. 61-11, PageID.1572.  However, Blick testified that while no one "directly" told her that she could not communicate with parents or staff members about matters unrelated to the investigation, she felt that it was "heavily implied."  ECF No. 61-5, PageID.1331;

8

*see also id.* at PageID.1359.  Blick did not ask Langford any questions about the letter.

According to Linden and Skiba, during the April 26, 2019 meeting, Blick expressed concern about the effect of the administrative leave on her reputation and stated that she wanted to keep the circumstances private.  ECF No. 61-8, PageID.1485–86; ECF No. 61-22, PageID.1704.  Linden thus offered to "ask the community to respect her privacy" in the letter that would be sent to the AAPSD/Lawton Community.  ECF No. 61-8, PageID.1488.

At some point, Blick discussed the April 26, 2019 Letter with Mike Madison, a former AAPSD principal and Blick's Union Representative.  ECF No. 64-14, PageID.2402, 2407.  Madison explained that the restrictions in the letter were "common practice for any administrator placed on administrative leave."  *Id.* at PageID.2407.  Madison told Blick the purpose of the restrictions was to stop the person on leave from talking to staff or parents "who could be asked questions" during the "ongoing investigation" so that the administrator does not "spoil the witnesses as the [D]istrict conducts their investigation."  *Id*.  Madison confirmed for Blick that these restrictions included not coming on to the premises without getting approval.  *Id*.  This was to minimize the chance of Blick running into a parent or staff member and "somehow mislead[ing]" the person or giving the person

9

information about the investigation.  *Id.*  Madison informed Blick this was meant to protect her and others.  *Id.*

### 6.  Blick's leave is communicated to the Lawton Community

On May 1, 2019, Linden met with Lawton staff to inform them of Blick's leave.  An audio recording of the meeting demonstrates that Linden told staff the details of the leave were "private matters."  *See* ECF No. 67-2 at 2:45.  She also instructed the staff not to ask Blick why she was on leave or to speculate amongst themselves about why she was on leave in case they were overheard by others.  *Id.* at 3:09.  After explaining who would be serving as interim principal, Linden stated, "Please know that when anyone is on a leave, they can't communicate. They're not emailing; they're not calling; they're not responding.  If you're sending something and you're not getting a response, it's not because [Blick] doesn't care about you, it's 'cuz she can't."  *Id.* at 7:00.  However, she clarified that staff should "absolutely reach out about child issues," pertaining to Blick's children.  *Id.* at 7:17.  Linden reaffirmed that Blick was "not leaving the Community" as she lived in the area and her children attended the school and that Lawton staff should feel free to "say hello" or "talk about the kids."  *Id.* at 7:25.

The same day, Linden sent a letter to the Lawton Community.  ECF No. 61-25, PageID.1751.  The letter stated, in relevant part: "[O]ur principal, Ms. Blick, will be on a leave of absence.  While we cannot share personnel information with you,

10

we want to reassure you that Lawton is deeply important to Ms. Blick and to us. During this time, she asks that you please respect her privacy." *Id*.  Blick maintains that she never asked for privacy.  ECF No. 64-2, PageID.1911.

The next day, Giles sent an email to Lawton teachers explaining how to convey Blick's leave to students. ECF No. 61-29, PageID.1771.

> Ms. Blick is going to be out of school and while she's gone, we will have a guest principal . . . .  Sometimes people take time off from their jobs because they have to take care of other really important things. Whatever those things are, it's important to understand that they are private.  You might see Ms. Blick when you are at the grocery store or here at school with Carson, Emily[,] and Lucas.  It's great to say hello and let her know you miss her but we should stay away from questions out of respect for her privacy.  Remember that Carson, Emily, and Lucas want to come to school and learn and play so let's stay focused on the fun of learning and being good friends by not asking questions of them either.

*Id*.

On May 3, 2019, a parent started a letter writing campaign, intending to send Linden 100 emails regarding Blick's positive impact on Lawton.  ECF No. 61-30, PageID.1773; ECF No. 64-13, PageID.2328.  As of May 6, 2019, the same parent also tried to organize people to attend the AABOE meeting scheduled for May 8, 2019 and speak in support of Blick.  ECF No. 61-32, PageID.1777.

### 7. May 7, 2019 meeting

On May 6, 2019, Linden emailed Blick and Skiba, copying Langford, asking Blick to plan to meet with her and Langford the next day for "a follow up interview to the ongoing investigation."[3]  ECF No. 61-33, PageID.1779.

Thus, on May 7, 2019, Blick, represented by Skiba, met with Linden and Langford.  ECF No. 61-22, PageID.1702; ECF No. 61-8, PageID.1516.  Langford and Linden testified that the purpose of this meeting was to ask Blick about the allegations of a possible improper relationship between her and Johnson as that might have provided Blick motivation to allow Johnson to claim excessive hours.  *See* ECF No. 61-7, PageID.1419; ECF No. 61-8, PageID.1517.  Blick started crying in response to a question about whether she was having a sexual relationship with Johnson, and Linden and Langford took a break to allow Blick to compose herself.  *Id.* at PageID.1524–25.  Blick denied the existence of an affair but admitted that Johnson had driven her places, that she had purchased Johnson a jersey to match her son's, that Johnson hugged her and kissed her on the cheek, and that Johnson might have told her she was "looking good for [him] today."  ECF No. 61-16, PageID.1652–53.

_____

[3] This email was sent at 9:42 AM.  ECF No. 61-33, PageID.1779.  Giles received an email informing her of the plan to speak at the AABOE meeting at 11:39 AM and forwarded it to Linden at 12:08 PM, well after she had called the meeting with Blick.  *Id.*; ECF No. 61-32, PageID.1777.

After the interview portion of the meeting, Linden told Blick "that her focus was to preserve [Blick's] reputation throughout the process."   ECF No. 61-5, PageID.1326.  The Parties agree that Linden stated that some Lawton parents had signed up to speak on Blick's behalf at the AABOE meeting on May 8, 2019.  *Id.*; ECF No. 61-8, PageID.1527.  The Parties also agree that Linden informed Blick that an MLive reporter would be present at the meeting and would likely file a Freedom of Information Act ("FOIA") request for her personnel file if she was brought up during the public comment portion of the meeting.  ECF No. 61-5, PageID.1326; ECF No. 61-8, PageID.1527.

Blick testified that Linden implied it was in Blick's best interest to stop the parents from speaking on her behalf or else the allegations of her affair with Johnson would be made public through the FOIA request of her personnel file; however, Blick conceded that she was not ordered to do anything.[4]   ECF No. 61-5, PageID.1327.  In contrast, Linden testified that she told Blick she was informing her about the reporter "because of the concerns that [Blick] had shared with [Linden] about her reputation and privacy."  ECF No. 61-8, PageID.1528.  According to

---

[4] Notably, Blick's friend and Lawton teacher, Jinx Cooke, ECF No. 61-23, PageID.1710–11, testified that Giles implied to her that it would not be helpful for parents to speak on Blick's behalf at the AABOE meeting and that Cooke, took the initiative to tell the parents not to attend without asking Blick about it first, ECF No. 61-23, PageID.1733.

13

Linden and Skiba, Blick indicated she did not want her personnel file subject to a FOIA request and asked Linden for the names of the parents who planned to speak so she could contact them and ask them not to, and Linden provided her their names. ECF No. 61-8, PageID.1526; ECF No. 61-22, PageID.1704. Notably, after the meeting, Blick sent Linden a text message thanking her for her "compassion" and confirming that she had spoken to the individual organizing the parental support at the AABOE meeting. ECF No. 61-34, PageID.1781.

Skiba affirmed that Blick did not mention during the May 7, 2019 meeting, or tell him at any other time, that she wanted to speak at the May 8, 2019 AABOE meeting. ECF No. 61-22, PageID.1703. Blick testified that, based on her interpretation of the April 26, 2019 Letter, she did not believe she was allowed to attend the May 8, 2019 AABOE meeting because it would require entering District property for a matter unrelated to her children. ECF No. 61-5, PageID.1335. As such, she was not planning to speak at the AABOE meeting at the time of her May 7, 2019 meeting with Linden and Langford. *See id*.

### 8. AAPSD turns over its investigation to outside counsel and then the Ann Arbor Police Department

In late April 2019, Madison texted Blick, *inter alia*, recommending that she look for employment outside of the AAPSD while on her administrative leave because there appeared to be "a strong case" for her termination and if the

14

investigation continued, "criminal charges could also occur."  ECF No. 61-18, PageID.1692.  Madison later learned that the investigation would not have stopped even if Blick had resigned.  *Id.* at PageID.2401.

At some point, David Comsa, AAPSD's General Counsel, retained independent counsel, Collins & Blaha, to investigate the potential improper expenditure of public funds.  ECF No. 61-35, PageID.1784.  Liz Nowland-Margolis, Executive Director of School Safety & District Operations, began communicating with a sergeant at the Ann Arbor Police Department ("AAPD") about the investigation at some point prior to June 18, 2019.  ECF No. 61-19, PageID.1695.  Then, on July 24, 2019, after Blick initiated the instant lawsuit, Linden contacted the Ann Arbor Police Department to file a formal report that Johnson and Blick had potentially engaged in fraud.  *See* ECF No. 61-8, PageID.1500.  As a general practice, when the AAPSD turns an investigation over to the police, the District does not make a final determination until it knows the outcome of the criminal case.  *See* ECF No. 61-7, PageID.1439.

AAPD interviewed several individuals and reviewed several documents over the course of its investigation.  ECF No. 61-15, PageID.1646.  Nowland-Margolis stayed in contact with the AAPD throughout its investigation.  ECF No. 61-19, PageID.1695.

15

### 9. MLive articles

On June 20, 2019, MLive, a local Ann Arbor publication, published an article entitled "Mystery surrounds principal's leave from Ann Arbor elementary school." ECF No. 61-27. The article states that Blick took "an abrupt and mysterious leave of absence" and that the leave was "without explanation." *Id.* at PageID.1760. The article refers to the May 1 Letter to the Lawton Community. *Id.* at PageID.1760–61. It also includes comments from Blick's attorney, Swift, and AABOE Trustees indicating that Blick is well-liked but that they could not provide details about the leave. *Id.* at PageID.1761–62.

MLive published another article about Blick on July 22, 2019. ECF No. 61-28. Titled "Principal files $5M lawsuit claiming Ann Arbor schools discriminates against whites," the article discusses the Complaint in the instant case. *Id.* The article indicates that the AAPSD denied requests from MLive for investigative documents because, according to the AAPSD, the release of records might interfere with an ongoing criminal investigation. *Id.* at PageID.1767. Nevertheless, AAPD stated there was no "report on file referencing over-billing at Lawton" at the time that MLive asked. *Id.*

### 10. Blick files discrimination charges

On July 15, 2019, Blick filed a Charge of Discrimination with the Equal Opportunity Employment Commission ("EEOC"). ECF No. 14-1, PageID.140.

16

Blick alleged race-based discrimination by Giles and that she believed Giles "targeted [her] because of [her] congenial relationship with an African American male employee." *Id*. The EEOC issued Blick a Right to Sue Letter on July 24, 2019, ECF No. 14-2, PageID.142, and Blick initiated the instant lawsuit, ECF No. 1.

### 11. Blick's ability to participate in the Lawton Community while on leave

#### i. Blick's engagement with Lawton parents and staff away from the Lawton campus

During Blick's administrative leave, she regularly worked out with her friend and then Lawton teacher, Jinx Cooke, and other Lawton parents several times per week. ECF No. 61-23, PageID.1710–11, 1717; *see also* ECF No. 61-24; ECF No. 61-45. The friend group also had a weekly social get together and visited Blick's household. ECF No. 61-23, PageID.1717. Blick also engaged socially with her neighbors, who were other Lawton parents. ECF No. 61-44, PageID.1811.

#### ii. Blick's engagement with the AABOE

On July 24, 2019 and again on August 14, 2019, Blick sent letters to Swift and Trustees of the AABOE outlining her grievances and demanding a name-clearing hearing. ECF No. 61-46; ECF No. 61-47. Additionally, a member of the Lawton Community specifically addressed the investigation into the potential misappropriation of public funds and related FOIA request during the public comments section of the July 31, 2019 AABOE meeting. *See* Ann Arbor Public

Schools, *Ann Arbor Public Schools Board of Education Meeting July 31, 2019*,

YouTube,                             https://www.youtube.com/watch?v=lIGK6UgP4YQ

[https://perma.cc/8BQB-VFH2] at 10:51.   Another Lawton parent shared her

displeasure with how the AABOE had handled things since April 2019. *Id.* at 16:02.

### iii.   Blick's engagement with Lawton

Notably, in the affidavit Blick submitted in support of her opposition to

Defendants' earlier motion to dismiss, she stated that Defendants "forbid [her] to

appear on Lawton premises, except for attending to [her] three children that attend

Lawton." ECF No. 25-2, PageID.664.   Nevertheless, the parties dispute the extent

to which Blick was able to participate with the Lawton Community on Lawton's

campus.

First, Blick was escorted off the premises on April 26, 2019, the day that she

was placed on leave.   ECF No. 61-5, PageID.1344.   She was thus unable to attend

her daughter's choir concert that evening, ECF No. 61-5, PageID.1344, and asked

Cooke to accompany her children, ECF No. 64-12, PageID.2289.   Second, in late

April 2019, Blick contacted the Lawton IT Department about getting access to her

school email and Google Drive.   ECF No. 64-14, PageID.2405.   As a result, Linden

contacted Madison, Blick's Union Representative, and asked him to remind Blick

that she should not be emailing staff or parents per the April 26, 2019 Letter.   *Id*.

Madison's actual communication to Blick just said that Linden told him that Blick

is "on administrative leave and not to email staff or parents."  ECF No. 64-2, PageID.1934.  Madison speculated to Blick that they were "trying to protect [her] from a zillion emails inquiring if [she was] okay."  *Id*.  Linden testified that Blick's email and Google Drive access were revoked as "standard practice" because there was an interim principal taking over her duties and they did not want "to have confusion about who might be answering or responding to what."  ECF No. 61-8, PageID.1512.

Third, on May 7, 2019, Blick's daughter ("E.B.") went out to lunch with a friend and that friend's mother, who either did not properly sign E.B. out of the school or was not on the list of people allowed to take E.B. out.  ECF No. 64-21, PageID.2616.  The next day, Jackie Ross, E.B.'s teacher, informed E.B. that she could not eat lunch in the office with her friend, who had to eat lunch in the office due to an illness and was going to start eating with a wider variety of students than just E.B.  *Id.* PageID.2615; ECF No. 64-8, PageID.2264.  E.B. then attempted to eat lunch in the auditorium with a friend from a different class, but Interim Principal Dottie Davis did not permit her to do so.  ECF No. 64-21, PageID.2615.  E.B. then went to have lunch in Cooke's classroom.  *Id*.  She also returned to Cooke's classroom during the afternoon recess and asked to call her mother, which Cooke allowed her to do.  *Id*.  According to Cooke, Giles later said that E.B. had been afforded special privileges due to her mother's position in the school but needed to

19

follow the same rules as the other students.  *Id*.  Cooke also stated that Davis and Giles told her not to allow E.B. to call Blick on Cooke's personal cell phone anymore.  ECF No. 64-8, PageID.2259.  Blick asked for a parent-teacher conference to discuss how May 8th went and plans for moving forward.  ECF No. 64-20.  Madison also reached out to Linden, who agreed to investigate what happened, ECF No. 64-22, PageID.2631, and Linden offered Blick a meeting on May 9, 2019.  Blick did not make any further complaints about her children's treatment at Lawton.

Fourth, Blick was permitted to finish out the spring season as head coach of her children's soccer team, but someone else was given the head coach position the following fall.  ECF No. 61-5, PageID.1365.  Blick felt that Linden implied she could not continue coaching at the April 26, 2019 meeting, but she concedes that no one told her she could not or gave her any reason for why she did not have the head coach position the following school year.  *Id*.  However, Jenna Bacolor, the Executive Director of AAPSD's Community Division who oversees the Community Education and Recreation Department, affirmed that Blick, along with other spring season soccer coaches, was sent an email on July 16, 2019 asking her to confirm her interest in coaching during the Fall 2019 season.  ECF No. 67-5, PageID.3015, 3016.  Blick did not respond by the due date of July 24, 2019, so she was offered and accepted the assistant coach position when she reached out in August 2019.  *Id.* at

20

PageID.3016–17.  Nevertheless, Blick and her husband were head coaches for the 2019 basketball season.  *Id.* at PageID.3017.

Fifth, Blick was not permitted to attend the 5th grade graduation ceremony at the end of the 2018–2019 school year, even though her son performed at the event, because the ceremony was only open to parents of graduates.  ECF No. 61-8, PageID.1487.  Linden testified that this was a policy that had been instituted by Blick the year prior.  *Id.* at PageID.1521.  While Blick testified that she was singled out and any parent could attend the graduation ceremony, ECF No. 61-5, PageID.1334–44, an email sent by the choir director a few days before the ceremony stated that kindergarten "parents [were] not allowed to attend the performance, due to overcrowding with the 5th grade parents in attendance," ECF No. 67-3, PageID.3002.

Sixth, Plaintiff was unable to enter the Lawton premises without first obtaining approval.  *See* ECF No. 64-14, PageID.2407.  However, during the 2019–2020 school year, due to threats made to Giles, Lawton had special security measures, including a security guard at the front door, another patrolling the outside of the building and the playground, and a visitor management system that involved presenting identification at the main office and receiving a visitor pass.  ECF No. 61-23, PageID.1737; ECF No. 61-38, PageID.1793.

Seventh, on September 17, 2019, Valerie Wesley, then Lawton teacher, texted Blick to inform her that the Lawton administration would not permit Blick to serve as Wesley's room parent "due to difficult circumstances," but Blick could still attend any classroom parties as long as she did not do so in a leadership capacity. ECF No. 61-41; ECF No. 61-5, PageID.1365–66. The interim principal also sent an email to Lawton staff that morning asking them to check with her or Giles before confirming any room parent assignments. ECF No. 61-41. Eighth, in the fall of 2019, Cooke texted Blick to inform her that Blick's son was having difficulty with his seasonal allergies, so Blick brought over-the-counter medication to the school. ECF No. 61-5, PageID.1345. However, the office workers would not allow the medication to be administered outside the office or without a doctor's note. *Id.* at PageID.1344. This is consistent with AAPSD Administrative Regulation 5600.R.01. ECF No. 67, PageID.2992.

Ninth, on October 17, 2019, Blick was a parent volunteer during Lawton's Battle of the Books contest, in which her daughter participated. *See* ECF No. 61-43, PageID.1808; ECF No. 61-5, PageID.1332. In that capacity, Blick asked students questions about the books they had read. *Id.* However, a few days later, Langford sent Blick an admonishing letter because, the day she visited for Battle of the Books, Blick was "observed entering the music classroom with kindergarten students and holding one of the students" despite it not being a class in which her children were

present and despite the discomfort of the music teacher, who had a strained relationship with Blick during her tenure as principal.  ECF No. 61-42, PageID.1806; ECF No. 61-43, PageID.1808.  The letter reminded Blick about the terms of her administrative leave as outlined in the April 26, 2019 Letter.  ECF No. 61-42, PageID.1806.  A letter from the music teacher indicated that Blick's actions were contrary to the plan the child's parents and teacher had developed to deal with the child's separation anxiety.  ECF No. 61-43, PageID.1808.  However, Blick testified that she used to run races with the child's mom, was aware that the child did not feel safe at school after an incident, and felt compelled to intervene when she saw the child crying.  ECF No. 61-5, PageID.1364.

### 12. The conclusion of the AAPD investigation

The AAPD investigation found that Blick and Johnson "engaged in common scheme to defraud the Ann Arbor Public Schools of over $25,000 which was ultimately paid to [Johnson] for work not performed."  ECF No. 61-15, PageID.1649.  AAPD requested charges of embezzlement, larceny by false pretenses, and conspiracy.  *Id.*  However, the prosecutor only charged Johnson with false pretenses.  *Id.* at PageID.1650.  Johnson was arraigned on March 5, 2020.  *Id.*  He was ultimately convicted and ordered to pay restitution.  ECF No. 61-5, PageID.1337.

The AAPSD waited until Johnson's criminal case concluded before resolving Blick's investigation.  ECF No. 61-8, PageID.1543.  Linden determined that Blick "had authorized unlawfully payment to Willie Johnson and had supported him in defrauding the Ann Arbor Public Schools through her negligence."  *Id*.  She thus made a recommendation to the AABOE to not renew Blick's administrative contract. *Id*.

### 13. The nonrenewal of Blick's administrative contract

On March 30, 2021, Langford issued Blick a "Notice of Consideration of Nonrenewal of Administrator's Contract."  ECF No. 61-48.  The letter provided, *inter alia*, that:

> The Board will be considering the nonrenewal of your administrator contract because of misconduct detrimental to the proper functioning and administration of your assigned school, including but not limited to, failing to properly safeguard District resources after being put on notice of potentially fraudulent activity.
>
> In particular, you authorized payment of money to a contract custodian at Lawton, who was also being paid by his employer for the same time.  Along with your failure to monitor, you signed approximately eleven documents which authorized payment to the contract custodian for as much as four hours while he was also being paid by his employer for the same time.

24

*Id*.  The letter also permitted Blick to request, in writing, a meeting with the AABOE to "discuss the reasons for the proposed nonrenewal of [her] contract" via open or closed session.  *Id*.

Plaintiff requested to speak, and spoke, at an open AABOE meeting on April 28, 2021.  *See Board of Education Meeting* 4/28/2021, CTN Video, https://ctnvideo.a2gov.org/CablecastPublicSite/show/4863?channel=1 [https://perma.cc/N77M-W82W] at 3:44:00.  Swift's presentation to the AABOE focused solely on Blick's role as a fiduciary of public funds and her failure to monitor the Lawton budget after being put on notice that Johnson was claiming excessive time; it did not mention her alleged relationship with Johnson.  *Id*.  Blick argued, *inter alia*, that Johnson was claiming excessive time before she became responsible for approving timesheets, she thought purchasing a time clock for the 2017–2018 school year had fixed the problem, and she trusted the timesheets she was given to sign were accurate.  *Id*.  Both Blick and Swift answered questions from the AABOE Trustees.  *Id*.  The AABOE Trustees unanimously voted not to renew Blick' contract at the meeting.  *Id*. at 04:25:00.  On April 29, 2021, Swift issued Blick a letter informing her of the nonrenewal of her administrative contract.   ECF No. 61-49.

On August 24, 2021, pursuant to her tenure rights, the AAPSD rehired Blick as an elementary school teacher at the Virtual Village.  ECF No. 61-7, PageID.1416;

ECF No. 61-5, PageID.1363.   Despite her tenure rights, Plaintiff was not paid for the two months between the nonrenewal of her administrative contract and when she was rehired as a teacher.   *See* ECF No. 64-4.   Defendants assert that this was due to a clerical error and that Blick received retroactive pay during December 2022 after the discrepancy was raised by counsel.   ECF No. 67, PageID.2996; ECF No. 67-9.

## B. Procedural Background

Plaintiff's Amended Complaint alleges claims against all Defendants under 42 U.S.C. § 1983 for racial discrimination via disparate treatment, in violation of the Equal Protection Clause (Count I) and violation of her right to due process in violation of the Fourteenth Amendment (Count V) as well as for infringement of her rights to freedom of speech and freedom from retaliation (Count II), freedom to petition (Count III), and freedom of association (Count IV), in violation of the First and Fourteenth Amendments. [5]   ECF No. 14.   Additionally, the Amended Complaint alleges claims against all Defendants for racial discrimination, in violation of Elliot-Larsen Civil Rights Act, MCL 37.2101, *et seq.* (Count VII), and for civil conspiracy to violate her rights under the First, Thirteenth, and Fourteenth Amendments, in violation of § 1983 (Count VIII).   *Id.* at PageID.131–135.   Finally, the Amended Complaint alleges additional claims against the AAPSD and AABOE for racial

---

[5] Plaintiff brings her claims against the Individual Defendants in their official and personal capacities.

26

discrimination via disparate treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Count VI). *Id.* at PageID.130–31.

On February 2, 2021, Judge Dawkins Davis granted in part and denied in part Defendants' Motion to Dismiss (ECF No. 16), retaining only Plaintiff's claims for freedom of speech (Count II), freedom to petition (Count III), and freedom of assembly (Count IV) under the First and Fourteenth Amendments. *Blick v. Ann Arbor Pub. Sch. Dist.*, 516 F. Supp. 3d 711, 735 (E.D. Mich. 2021). Subsequently, on October 20, 2021, Judge Dawkins Davis issued a stipulated order dismissing Count III, Plaintiff's claim under § 1983 for infringement of her right to freedom to petition under the First and Fourteenth Amendments. ECF No. 36.

As such, the only claims still pending are Plaintiff's claims under § 1983 for infringement of her rights to freedom of speech (Count II) and freedom of association (Count IV) under the First and Fourteenth Amendments. As discussed in greater detail *infra*, Defendants move for summary judgment on these claims. ECF No. 61. They also seek an award of attorneys' fees and costs under 42 U.S.C. § 1988 and 2000e-(5)k and 28 U.S.C. § 1927. *Id.* at PageID.1207.

### III.   LAW & ANALYSIS

#### A. Legal Standard

Federal Rule of Civil Procedure 56(a) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). "A fact is material if its resolution will affect the outcome of the lawsuit." *F.P. Dev., LLC v. Charter Twp. of Canton, Michigan*, 16 F.4th 198, 203 (6th Cir. 2021). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, no genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted).

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Pineda v. Hamilton Cty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Thus, if the nonmoving party will bear the burden of proof on a claim, the movant "need only demonstrate that the nonmoving party has failed to 'make a showing sufficient to establish the existence of an essential element' of that claim." *Id.* (quoting *Celotex*, 477 U.S. at 322). Thereafter, "the nonmoving party

28

must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).   Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *see also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[The] general rule [is] that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." (quotation marks omitted)).

## B. Discussion

As the parties agree, to state a claim under 42 U.S.C. § 1983 against an official in her personal capacity, a plaintiff must establish "that (1) a person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right." *Berger v. City of Mayfield Heights,* 265 F.3d 399, 405 (6th Cir. 2001); *see also* ECF No. 61, PageID.1230 (citing *Berger*); ECF No. 64, PageID.1875–76 (same).

### 1. Freedom of Speech - "prior restraint" claim (Count II)

Plaintiff alleges that Defendants impinged upon her freedom of speech by interfering with her freedom to speak on issues of public concern by filing a suit in a court of law; freedom to attend school board meetings and voice her opinions on matters of public concern on public property, freedom from compulsion to speak a

particular message; freedom to speak to anyone connected with the AAPSD and AABOE, including parents, that she would like to; and freedom to make FOIA requests about matters of public concern from the AAPSD and AABOE.  ECF No. 14, PageID.120.

Compelled speech and compelled silence claims are analyzed the same under the First Amendment.  *See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796–97 (1988).  The Sixth Circuit has sometimes characterized a public employer prohibiting an employee from speaking to certain people or about certain topic as a "prior restraint."[6]  *See, e.g.*, *Farhat v. Jopke*, 370 F.3d 580, 598 (6th Cir. 2004).  In assessing such a claim, the Court "appl[ies] the two-part *Pickering* analysis to determine whether [the April 26, 2019 Letter or Linden's statements at the May 7, 2019 meeting] [were] an unconstitutional prior restraint of a public employee's speech."  *Whitney v. City of Milan*, 677 F.3d 292, 296 (6th Cir. 2012) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)); *Farhat*, 370 F.3d at

---

[6] *But see Ostergren v. Frick*, 856 F. App'x 562, 568 (6th Cir. 2021) (noting the split within the Sixth Circuit over whether "informal actions by government officials may also constitute prior restraints, such as threats or informal directives that share the same functional characteristics of more traditional prior restraints," which are usually "judicial injunctions targeting future speech [or] licensing schemes that require a speaker to obtain approval from a state official before speaking" (*comparing Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019) *and Whitney v. City of Milan*, 677 F.3d 292, 295-99 (6th Cir. 2012) *with Kesterson v. Kent State Univ.*, 967 F.3d 519, 524, 526 (6th Cir. 2020)).  Regardless, the same analysis applies.

598).  First, the Court determine[s] "whether the affected speech involved a public employee's comments as a private citizen on a matter of public concern." *Id.* (citing *Farhat*, 370 F.3d at 588, 598).  Notably, this step "consists of two distinct components." *Holbrook v. Dumas*, 658 F. App'x 280, 284 (6th Cir. 2016).  Second, "if the speech involves a matter of public concern, then [the Court] must balance the interests of the public employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Whitney*, 677 F.3d at 296. (quoting *Connick v. Myers*, 461 U.S. 138, 140 (1983)).

As a preliminary matter, it is not clear how Defendants prohibited Plaintiff from filing a law suit—indeed, she does not appear to have had any problems filing the instant action—or making FOIA requests from the AAPSD or AABOE. Plaintiff, in her Response, does not address Defendants' argument that these allegations are unsupported by the record, *see* ECF No. 64, and thus effectively concedes the issue, *Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740, 759 (E.D. Ky. 2019) (citing *Rouse v. Caruso*, No. 06-cv-10961-DT, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011), *report and recommendation adopted*, 2011 WL 893216 (E.D. Mich. Mar. 14, 2011)); *see also Haliburton v. City of Ferndale*, No. 2:21-CV-10864-TGB-APP, 2023 WL 581651, at *10 n.3 (E.D. Mich. Jan. 27, 2023).  Moreover, the

31

Court is unaware of any evidence in the record to support Plaintiff's allegations. [7]

Accordingly, Defendants are entitled to summary judgment on these claims.

Likewise, the Court acknowledges that there is ambiguity as to whether

Plaintiff was, in fact, *restrained* from attending the May 8, 2019 AABOE meeting.

Indeed, Plaintiff testified that nobody ordered her not to attend or to stop others from

attending the meeting, but that Linden heavily implied it would be in her best interest

to do so.    ECF No. 61-5, PageID.1327.    Assuming *arguendo* that Plaintiff's

testimony is accurate, it is not at all clear that discouraging an employee from speech,

without prohibiting the speech, is sufficient to support a prior restraint claim.    *See*

*Kesterson v. Kent State Univ.*, 967 F.3d 519, 526 (6th Cir. 2020) (affirming district

court's grant of summary judgment on prior restraint claim where defendant-coach

told plaintiff-player not to tell anyone about sexual assault because a prior restraint

is an "administrative or judicial order that forbids speech in advance" and "impose[s]

a legal impediment" (cleaned up) (citations omitted)).    However, the Court need not

resolve this question.    For the reasons discussed in Section III, Subsection B, Part 1,

---

[7] At best, the July 22, 2019 MLive article mentions that the AAPSD declined to disclose investigative documents to the publication because doing so might interfere with the ongoing investigation.  ECF No. 61-28, PageID.1767.  However, there is no allegation that the AAPSD refused to comply with a FOIA request.  Regardless, given that there is no indication that Blick is affiliated with MLive, she does not have standing to bring a claim on the publication's behalf.

Subpart iii *infra*, the Court finds that Defendants are entitled to summary judgment on Plaintiff's prior restraint claim because *Pickering* balancing favors Defendants.

Lastly, the Court addresses Plaintiff's several assertions that Defendants prohibited her "from communicating with Lawton parents, teachers or staff *for any reason*." *See e.g.*, ECF No. 64, PageID.1876. This allegation is belied by the record. As discussed in Section II, Subsection A, Part 11, Subparts i and iii *supra*, there is ample evidence of Plaintiff communicating and socializing with several Lawton parent, teachers, and staff in her capacity as both a parent of Lawton students and friend to people who were themselves Lawton teachers or staff. While a court should generally not make a credibility determination or otherwise weigh evidence when ruling on a summary judgment motion, *Anderson*, 477 U.S. at 255, an exception exists where "opposing parties tell two different stories, one of which is basically contradicted by the record, so that no reasonable jury could believe it." *Scott*, 550 U.S. at 380.

Additionally, such a broad restriction, if it existed, would necessarily involve matters that are not of public concern, and are thus not entitled to First Amendment protection. *See Baar v. Jefferson Cnty. Bd. of Educ.*, 311 F. App'x 817, 821 (6th Cir. 2009) (finding employee's email about an upcoming association meeting did "not pertain to 'a subject of legitimate news interest' or a 'subject of general interest and of value and concern to the public'" and was thus not protected speech under

33

the First Amendment (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) (per curiam))); *Whitney*, 677 F.3d at 297 ("[T]o the extent [employer's] order interfered with [plaintiff's] personal communications with [former employee], that speech is not a matter of public concern.").  "Absent protected speech, the First Amendment does not empower a public employee to 'constitutionalize the employee grievance,' even if (as may be the case here) the communication is important to the employee." *Baar*, 311 F. App'x at 821. (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006)).  Thus, the Court focuses its analysis on the speech restricted by the April 26, 2019 Letter, which informed Plaintiff that she was being placed on administrative leave "pending an investigation of allegations of potential fraud and misconduct" and directed her "not to contact any students, parents, or staff regarding this matter" (hereinafter "restricted speech").  ECF No. 61-20.

> **i.    The restricted speech implicated Plaintiff's role as a private citizen.**

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (quoting, 547 U.S. at 421).  This is because "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee

34

might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created."  *Garcetti*, 547 U.S. at 421–22.

Defendants argue that "Plaintiff's desired speech would either be made pursuant to her official duties or would not address matters of public concern."  ECF No. 67, PageID.2993.  The April 26, 2019 Letter directed Plaintiff "not to contact any students, parents, or staff regarding" the investigation into her potential fraud and misconduct.  ECF No. 61-20.  Although, Plaintiff would have regularly communicated with students, parents, and staff pursuant to her duties as principal of Lawton, the restricted speech was not the type in which Plaintiff would have usually engaged during the course of her employment.  Indeed, Defendants imposed the restriction on Plaintiff as they placed her on administrative leave, when she would necessarily not have been engaging in her official duties as principal of Lawton.  *See Westmoreland*, 662 F.3d at 719 ("Nothing in the record supports the claim that plaintiff's expression was made pursuant to a task that was within the scope of his official duties."); *see also Holbrook*, 658 F. App'x at 284 ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." (quoting *Lane*

*v. Franks*, 573 U.S. 228, 240 (2014)).  Because of this, the Court concludes that the restricted speech implicated Plaintiff's role as a private citizen.[8]

### ii.   The restricted speech addressed a matter of public concern.

As the Sixth Circuit has explained:

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S. Ct. 1684.  Speech which can be "fairly considered as relating to any matter of political, social, or other concern to the community" touches upon matters of public concern. *See id.* at 146, 103 S. Ct. 1684. Absent unusual circumstances, a public employee's speech dealing with "matters only of personal interest" is not afforded constitutional protection. *See id.* at 147, 103 S. Ct. 1684.  However, mixed questions of private and public concern, where the employee is speaking both as a citizen as well as an employee, can be protected, *see Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 366 (5th Cir. 2000), such that "if any part of an employee's speech, which contributes to the [disciplinary action], relates to a matter of public concern, the court must conduct a balancing of interests test as set forth in *Pickering v. Board of Education,* 391 U.S. 563, 88 S. Ct. 1731, 20 L.Ed.2d 811 (1968)." *Rahn v. Drake Ctr., Inc.,* 31 F.3d 407, 412 (6th Cir. 1994) . . . .

---

[8] Assuming *arguendo* that Linden prohibited Plaintiff from speaking at the May 8, 2019 AABOE meeting, the same analysis would apply. *See Westmoreland*, 662 F.3d 719 (holding that public employee who spoke at a city council meeting during public comment period while off duty and out of uniform was speaking as a private citizen despite identifying himself as a public employee).

*Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001). For example, "even if speech addresses an internal personnel dispute, it may involve a matter of public concern if the dispute arose from "actual or potential wrongdoing or any breach of the public trust." *Myers v. City of Centerville, Ohio*, 41 F.4th 746, 761 (6th Cir. 2022) (quoting *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001)). "While motive for the speech is a relevant factor, . . . 'the pertinent question is not *why* the employee spoke, but *what* [s]he said.'" *Westmoreland*, 662 F.3d at 719 (emphasis in original) (quoting *Farhat*, 370 F.3d at 591).

The April 26, 2019 Letter directed Plaintiff "not to contact any students, parents, or staff regarding" the "investigation of allegations of potential fraud and misconduct." ECF No. 61-20. Like Judge Dawkins Davis did at the motion to dismiss stage, the undersigned finds that "Blick's restricted speech concerns both private and public matters." *Blick*, 516 F. Supp. 3d at 725. The Court recognizes that Plaintiff's communications about her leave and the investigation necessarily involve a personnel dispute and that her motive in speaking about these topics would have been to defend herself. Nevertheless, the context of the restricted speech—the employment status of a public school administrator—is important to the parents and children of the Lawton Community. *Id.* at 726 (citing *Lewis v. Harrison Sch. Dist.*, 805 F.2d 310, 314 (8th Cir. 1986); *Piver v. Pender Cnty. Bd. of Educ.*, 835 F.2d 1076, 1080 (4th Cir. 1987)). Additionally, the content of the restricted speech—the

37

placement of a school principal on leave pending an investigation into embezzlement—is a dispute arising from "potential wrongdoing or [the] breach of the public trust." *Myers*, 41 F.4th at 761 (quoting *Brandenburg*, 253 F.3d at 898). As such, the "focus, point, or communicative purpose" of the restricted speech is a matter of public concern.[9] *See Farhat*, 370 F.3d at 593 (internal quotation marks and footnotes omitted).

*Farhat*, on which Defendants rely to argue the restricted speech did not address a matter of public concern, ECF No. 61, PageID.1232, does not compel a different finding. The plaintiff-appellant in *Farhat* was a school custodian with a history of hostile communications directed at school district employees and union affiliates. 370 F.3d at 584. He received several warnings and other discipline for this behavior, which he usually responded to via letter that was directed at the individuals with whom he had a disagreement and primarily consisted of "personal opinions and conclusions" as well as various insults. *Id.* at 584–85. In the incident giving rise to his lawsuit, the *Farhat* plaintiff was passed over for a job and threatened the coworker whom he held responsible. *Id.* at 585. The plaintiff was then suspended with pay while the incident was investigated and instructed by letter not to speak to other employees during his suspension. *Id.* at 586. The plaintiff

---

[9] The Court notes that the same analysis would apply to Plaintiff's allegations that Defendants restricted her from participating in the May 8, 2019 AABOE meeting.

38

responded with two letters of his own, *inter alia*, viscously insulting various school district employees and, without examples or evidence, claiming that district employees had been plotting against him, engaging in corruption, and colluding with his union representative. *Id*. The Sixth Circuit concluded that, "viewed in the context of the complete record, . . . the primary focus, point, or communicative purpose of [plaintiff's] letters was his own personal beef with the union and the school district concerning his deteriorating job situation, and his references to collusion or corruption were passing references that were incidental to the message conveyed." *Id.* at 593 (internal quotation marks and footnotes omitted).

Notably, the public concern analysis in *Farhat* is with respect to a First Amendment retaliation claim and regarding speech that actually occurred. *See id.* (discussing the content of plaintiff-appellant's letters). When analyzing the prior restraint claim, the Sixth Circuit assumed *arguendo* that the restricted speech involved a matter of public concern based on its earlier analysis and proceeded to *Pickering* balancing. *Id.* at 598. In contrast, here, there is no speech for the Court to assess. However, given that the content of the restricted speech was the employment status of a school administrator and an investigation into the misappropriation of public funds and given that the summary judgment standard favors the nonmovant, *Anderson*, 477 U.S. at 255, the Court infers that while the restricted speech necessarily involved Plaintiff's "beef" with Defendants, the "focus,

point, or communicative purpose" of Plaintiff's restricted speech was a matter of public concern.[10]   Additionally, unlike in *Farhat*, the record here does not demonstrate that Plaintiff had a history of confrontational or threatening speech that would indicate any references to issues of public concern would be merely incidental.

Furthermore, that the restricted speech involved matters of public concern is evidenced by the interest and activity Plaintiff's placement on administrative leave garnered.   Parents organized to speak at the May 8, 2019 AABOE meeting about Plaintiff's administrative leave.   A local publication wrote an article about the "mystery" surrounding Plaintiff's departure after she had been gone from Lawton about two months and another article about the lawsuit she initiated regarding her departure.   Most tellingly, Defendants themselves developed strategies to inform Lawton staff, parents, and students about Plaintiff's leave so as to reduce concern

---

[10] The Court acknowledges that in her Response, Plaintiff stated that her "primary focus in exercising her First Amendment rights was to freely communicate with her children, and other Lawton parents and staff, to address her children's education and needs, and to address the numerous concerns of the Lawton parents and staff regarding Lawton students' welfare and education needs with Plaintiff being placed on administrate leave without explanation."   ECF No. 64, PageID.1878.   However, these all seem to speak to *why* Plaintiff wanted to speak as opposed to *what* she intended to say, and they are thus less pertinent to the public concern analysis.   *See Westmoreland*, 662 F.3d at 719 (quoting *Farhat*, 370 F.3d at 591).

about the impact on the school's operation.  As such, the Court concludes that the restricted speech addressed a matter of public concern.

### iii.    *Pickering* balancing favors Defendants

However, that Plaintiff was restricted from speaking as a private citizen on a matter of public concern is not dispositive.  Next the Court must conduct the *Pickering* balancing test to determine "whether the government had 'an adequate justification for treating the employee differently from any other member of the public' based on the government's needs as an employer." *Lane*, 573 U.S. at 242 (quoting *Garcetti,* 547 U.S., at 418).  *Pickering* analysis weighs "the employee's interest in 'commenting upon matters of public concern'" against "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (quoting *Pickering*, 391 U.S. at 568).

> When striking a balance between the parties' respective interests, we "consider whether an employee's comments meaningfully interfere with the performance of h[er] duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky,* 24 F.3d 1526, 1536 (6th Cir. 1994).

*Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 529 (6th Cir. 2015).  The Court also considers whether the speech "interferes with the regular operation of the

41

enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). "Application of the Pickering balancing test is a matter of law for the court to decide." *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017) (quoting *Farhat*, 370 F.3d at 593).

Here, Plaintiff describes her interests as "speaking on parental, student and educational matters, as well as commenting on the improper actions of Defendants." ECF No. 64, PageID.1879. Although Plaintiff defines the topics she desired to speak on broadly, for the purposes of First Amendment prior restraint analysis, the Court is only concerned with her interest in speaking about matters concerning her placement on administrative leave or the investigation into the potential fraud or misconduct, *i.e.*, the "restricted speech." In contrast, Defendants describe their interests as restricting Plaintiff from speaking to Lawton students, parents, and teachers *about the investigation* while it was pending to protect everyone involved from retaliation (including Plaintiff), avoid disruption of school operations, and to ensure the integrity of the investigation." ECF No. 61, PageID.1234 (bolding in original changed to italics). For the reasons discussed *infra*, the Court finds that Defendants' interests outweigh Plaintiff's under these circumstances.

The first *Pickering* consideration—whether the restricted speech would have interfered with Plaintiff's job duties—favors Plaintiff. As discussed in Section III, Subsection B, Part 1, Subpart, i *supra*, Defendants imposed this restriction on Plaintiff at the same time that they placed her on administrative leave. Because

42

Plaintiff was relieved from her job duties as Principal of Lawton at the time the restriction was imposed, it necessarily could not have interfered with her professional responsibilities. However, each of the other considerations favor Defendants.

With respect to the second *Pickering* consideration, the Sixth Circuit has recognized that conducting an internal investigation into potential misconduct, without interference from employees, is a legitimate goal or mission of a public employer. *See Farhat*, 370 F.3d at 598 (finding prior restraint "was reasonable in light of the employer's interest in completing its investigation and in protecting the workplace."). In *Farhat*, the Sixth Circuit case most similar to the one at bar, the Sixth Circuit found that *Pickering* balancing favored the defendant-school district where the school district's interest was in investigating the plaintiff's conduct towards a coworker and the prior restraint was limited to the duration of the investigation into the plaintiff-custodian, only restricted him from speaking to his coworkers, and was geared toward preventing disruption of the workplace and interruption of the investigation. *Id.*

Here too, Defendants interest was in investigating Plaintiff for her potential misconduct. The Court notes that the restriction imposed on Plaintiff was broader in some ways than the restriction in *Farhat*—specifically, the restriction here was longer because Plaintiff's administrative leave ended up being much longer than the

43

*Farhat* plaintiff's suspension, and the restriction here prohibited Plaintiff from talking to people other than her coworkers.  However, in other ways, the restriction here is narrower because it only prohibited Plaintiff from speaking about the investigation itself, as opposed to being a blanket ban on communication. Additionally, as in *Farhat*, the reason for the restriction here was to keep Plaintiff from interfering with investigation.   Plaintiff herself agreed that it would be inappropriate for someone under investigation to influence witnesses.

The Sixth Circuit also concluded *Pickering* balancing favored a public employer's interest in conducting an internal investigation, without interference from employees, in *Gillis v. Miller*.  845 F.3d at 688.  There, the Sixth Circuit held that "jail officials have a compelling interest in preventing their employees from advising other employees to delay or obstruct [an] investigation" into potential drug trafficking in the jail that "outweigh[s] any freedom of speech interests [p]laintiffs may have had in posting" a memorandum about union members' rights with respect to the investigation.  *Id.* at 687–88.  The rights outlined in the memorandum focused on the ability to demand a union representative be present at any questioning.  *Id.* at 682.   In finding for the defendants, the *Gillis* Court noted the importance of investigating drug smuggling in jails, which "could cause harm or loss of life to the numerous staff and inmates," particularly when facilitated by jail officials.  *Id.*

44

While the stakes at issue in *Gillis* were more serious than an investigation into the potential misappropriation of public funds, as happened here, such investigations are also important. *See Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."). This is particularly true when the potential misappropriation involves public schools, which traditionally do not have excess funds to begin with. As such, the Court concludes Defendants had a legitimate interest in conducting their investigation without Plaintiff speaking about it in a way that might taint or influence witnesses.

The last few *Pickering* considerations can be generally consolidated as whether the restricted speech will cause workplace disruptions. *See Connick*, 461 U.S. at 152. Where the public employer does not provide evidence of actual disruption, the court "must assess whether the employer could reasonably predict that the employee speech would cause disruption[.]" *Gillis*, 845 F.3d at 687 (citations omitted). Here, the Court finds Defendants could have reasonably predicted Plaintiff's restricted speech would have been disruptive for at least two reasons.

First, Defendants could have reasonably predicted that Plaintiff speaking negatively about her placement on administrative leave could have severely impacted Lawton's operations, *i.e.*, providing an education to its students. The Court takes judicial notice of students in the Eastern District of Michigan protesting several

45

school employment decisions, including by walking out of lessons or staging sit-ins.
*See, e.g.*, Susan Smiley, *Eastpointe High School students walk out to protest firing of principal*, Macomb Daily, May 10, 2023, https://www.macombdaily.com/2023/05/10/eastpointe-high-school-students-walk-out-to-protest-firing-of-principal/ [https://perma.cc/BV2A-94S9]; Brandon Hudson, *Massive walkout at Dearborn Heights' Annapolis High School after principal's sudden suspension*, Fox 2 Detroit, May 9, 2023, https://www.fox2detroit.com/news/massive-walkout-at-dearborn-heights-annapolis-high-school-after-principals-sudden-suspension [https://perma.cc/7D4Y-2W4W]; Frank Defrank, *VIDEO: Students protest firing of Lincoln principal*, Macomb Daily, April 20, 2010, https://www.macombdaily.com/2010/04/20/video-students-protest-firing-of-lincoln-principal/ [https://perma.cc/RU29-J3VQ]. Notably, one such student protest occurred just two days before Defendants placed Plaintiff on administrative leave. *See Mount Clemens high school students protesting non-contract renewal of principal*, Fox 2 Detroit, Apr. 24, 2019, https://www.fox2detroit.com/news/mount-clemens-high-school-students-protesting-non-contract-renewal-of-principal [https://perma.cc/JJW3-2WPJ]. Indeed, Lawton parents started to organize (less disruptive) forms of protest until Plaintiff, willingly or not, put a stop to their activities. It would thus not have been unreasonable for Defendants to fear escalation, particularly in light of the history of

46

protest over principal terminations or suspensions in the area.  Such a protest would have necessarily disrupted school operations.  *Cf. Whitney*, 677 F.3d at 298 (holding that defendant's fear of workplace disruption from plaintiff "fraterniz[ing] with a former, disgruntled employee" was insufficient to justify prohibiting the plaintiff from "promoting" former employee's allegations against the defendant or participating in former employee's lawsuit against the defendant where the plaintiff had no history of disruptive behavior).

Second, it appears that Plaintiff intended to accuse Giles of orchestrating her placement on administrative leave because Giles "coveted [Plaintiff's] position as Principal of Lawton," *see, e.g.*, ECF No. 1, PageID.6, and/or imply that Giles was in charge of the lunch period and thus at fault for Johnson's actions, *see, e.g.*, ECF No. 64, PageID.1868.  In *Farhat*, the Sixth Circuit recognized that public employers may, consistent with the First Amendment, prohibit their employees from being rude to their coworkers.  370 F.3d at 594 (citing *Waters v. Churchill*, 511 U.S. 661, 673 (1994)).  This is because

> [t]he reason the governor may . . . fire [a robustly critical high-ranking] deputy is not that this dismissal would somehow be narrowly tailored to a compelling government interest.  It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively.

*Id.* (second and third alteration in original) (citing *Waters*, 511 U.S. at 675).  It is clear from the record and Plaintiff's own pleadings that she and Giles had a contentious relationship.  *See e.g.*, ECF No. 61–9.  Permitting Plaintiff to badmouth Giles, Lawton's Assistant Principal, in connection with the investigation could have interfered with continued operations at Lawton, created disharmony among Lawton's employees, and tainted Defendants' legitimate goal of investigating the potential misappropriation of the lunch hour budget.  Indeed, the Sixth Circuit has noted that it would not be speculative for a public employer to worry about workplace harmony if one of its employees leveled unfounded accusations that her colleagues are corrupt in the press.[11]  *Gillis*, 845 F.3d at 685 n.2.  Accordingly, the Court concludes Defendants could have reasonably predicted that the restricted speech would have caused disruptions.

Lastly, although not necessary, *Farhat*, 370 F.3d at 594 (citing *Waters*, 511 U.S. at 675), the Court determines the restriction was narrowly tailored to accomplish a legitimate goal.  For example, in *Baar v. Jefferson Cnty. Bd. Of Educ.*, the defendant-school district prohibited the plaintiff-employee from contacting a coworker whom he had harassed in the past for any reason.  311 F. App'x at 820.

---

[11] At this time, the Court takes no position on these particular accusations against Giles as addressing them is not necessary to resolving Plaintiff's First Amendment claims.

48

The Sixth Circuit held that *Pickering* balancing favored the defendant-school district on the plaintiff-employee's prior restraint claim even if the future communications might have involved matters of public interest.  *Id.* at 821.  In so finding, the *Baar* Court emphasized that the restriction "applie[d] only to communications with [the harassment victim], permitting [the plaintiff] to speak freely on *any matter* of public interest to *anyone else* in *any forum* he wishes, and thus deals with the underlying harassment problem in the most natural and narrow way possible: by barring [the plaintiff] from speaking directly to [the harassment victim]."  *Id.* at 822 (emphasis in original).  So too here.  The April 26, 2019 Letter directed Plaintiff not to speak to members of the Lawton Community regarding her placement on administrative leave or the investigation into her potential fraud and misconduct.  It did not restrict her from speaking to people for any other reason or about any other topic, and the record is replete with examples of Plaintiff engaging with members of the Lawton Community in other contexts.

As such, the Court concludes that *Pickering* balancing favors Defendants. The cases on which Plaintiff relies do not support an alternative result.  First, in *Myers v. Cty of Centerville, Ohio*, the defendants' interests amounted to the ability to make personnel decisions without criticism from employees, particularly employees from a different department than the one being discussed.  41 F.4th at 764.  In finding the defendants failed to meet their "minimal" burden under

49

*Pickering*, the Sixth Circuit emphasized that *Pickering* does not insulate public employers from criticism. *Id.* at 765. Here, unlike in *Myers*, Defendants' interests were not (just) in avoiding criticism from a disgruntled employee but also in conducting an internal investigation into an employee's potential misappropriation of public funds without interference from said employee and in avoiding workplace disruptions. As discussed *supra*, these are legitimate interests. Second, *Perry v. Sindermann*, 408 U.S. 593 (1972) is wholly inapposite to the instant case. The only analysis concerning a First Amendment claim was whether the plaintiff's lack of tenure was dispositive with respect to his retaliation claim, *id.* at 596–98, which is not at issue here. Third, in *Garcetti*, the Supreme Court, notably, found that the speech at issue was made pursuant to the plaintiff's employment duties and thus not subject to First Amendment protections. 547 U.S. at 422. In the portion of the opinion Plaintiff cites, the Supreme Court noted that employees whose speech is not protected by the First Amendment can still rely on whistleblower statutes and labor codes to expose corruption. *Id.* at 425–26. This directly undermines Plaintiff's argument that Defendants' position allows public employers to hide their misconduct from scrutiny. *See* ECF No. 64, PageID.1879–80.

Accordingly, the Court holds that the Individual Defendants are entitled to summary judgment on Plaintiff's First Amendment prior restraint claim.

50

## 2.  Freedom of speech - retaliation claim (Count II)

Plaintiff also alleges that Defendants retaliated against her for engaging in constitutionally protected acts and opposing their illegal conduct by constructively terminating her employment and filing "a false and unsubstantiated police report" about her.  ECF No. 14, PageID.121.

To establish a prima facie case of First Amendment retaliation under § 1983, Plaintiff must demonstrate that:

> (1) the plaintiff engaged in protected conduct [i.e., constitutionally protected speech]; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) . . . the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Myers v. City of Centerville, Ohio*, 41 F.4th 746, 759 (6th Cir. 2022) (alteration in original) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).  For Plaintiff to establish that her speech is protected under the First Amendment, she must show that it "touches on a matter of public concern" and that her "interest in the speech outweighs the government's countervailing interest in prompting the efficiency of the public service it provides as an employer." *Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003) (citing *Connick*, 461 U.S. at 147; *Pickering*, 391 U.S. at 574).

51

If the plaintiff establishes a prima facie case of retaliation, "the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id*. (quoting *Dye*, 702 F.3d at 294–95).

For the reasons discussed in Section III, Subsection B, Part 1 *supra*, the Court finds that the restricted speech touched on a matter of public concern but that Plaintiff's interest in the speech did not outweigh Defendants' interests in investigating the potential misappropriation of the lunch hour budget without interference or in minimizing disruptions at Lawton.  Because *Pickering* balancing favors Defendants, Plaintiff cannot establish that she engaged in constitutionally protected conduct and thus cannot establish a retaliation claim.

However, assuming *arguendo* that Plaintiff was prohibited from engaging in constitutionally protected speech, she cannot, as a matter of law, establish the remaining elements of a retaliation claim.  Plaintiff argues that Defendants subjected her to the following adverse actions: filing a police report days after she filed her Complaint, blocking Plaintiff from coaching her children's soccer team, prohibiting

52

Plaintiff from serving as a room parent during the 2019–2020 school year, harassing Plaintiff's children at Lawton, and not-renewing Plaintiff's administrative contract. ECF No. 64, PageID.1881.

Three of these examples do not constitute adverse actions for purposes of a First Amendment retaliation claim. Judge Dawkins Davis already held that the filing of a police report is not an adverse action, *Blick*, 516 F. Supp. 3d at 723, and Plaintiff has not provided any legal support to the contrary. Additionally, the inability to act as a room parent for a single school year would not deter a person of ordinary firmness from engaging in protected speech, particularly where, as here, Plaintiff was still able to participate as a Lawton parent in a variety of other ways. *See Thaddeus-X*, 175 F.3d at 398 (noting public employees "may be required to tolerate more than average citizens" before an action is considered adverse and that certain deprivations are so *de minimis* they do not rise to the level of constitutional violations). Lastly, Plaintiff gives a single example of her children being harassed: on May 8, 2019, Plaintiff's daughter was not permitted to eat lunch in the office or with a student from a different class and Cooke was instructed not to allow E.B. to use Cooke's personal cell phone to call her mother anymore. However, it is not clear that actions taken against another individual can constitute adverse actions for purposes of a First Amendment retaliation claim. *See Myers*, 41 F.4th at 759 (noting that the second element of a First Amendment retaliation claim is that "an adverse

53

action was taken *against the plaintiff* . . . ." (emphasis added) (quoting *Thaddeus-X*, 175 F.3d at 394)).  Even if they can, the "harassment" was *de minimis*.  E.B.'s movements within the school were restricted for one day, in ways that are consistent with how other students at Lawton are treated.  Moreover, Defendants met with Plaintiff the next day to address the issue.  This is not the sort of conduct that would deter a person of ordinary firmness from engaging in protected speech.

Furthermore, even if blocking Plaintiff from being the head coach of children's soccer team constitutes an adverse action, Plaintiff cannot establish causation.  "A First Amendment retaliation claim under § 1983 ultimately requires a 'but-for' causal connection—meaning that the public employer would not have taken the harmful action 'but for' the protected speech." *DeCrane v. Eckart*, 12 F.4th 586, 602 (6th Cir. 2021) (citing a *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)).  Here, no rational trier of fact could find for Plaintiff on this issue.  *See Scott*, 550 U.S. at 380 (citation omitted).  Indeed, the record before the Court contradicts Plaintiff's assertion that she was "blocked" from continuing to coach her children's soccer team.  Instead, the record demonstrates that Plaintiff failed to timely submit the paperwork to continue in the head coach position and so was permitted to serve as an assistant coach as an alternative.  As such, her "demotion" to assistant coach would have happened regardless of any protected speech in which

Plaintiff may have participated.  This is further evidenced by the fact that Plaintiff and her husband were head coaches of the basketball team during the season at issue.

Finally and most importantly, even if Plaintiff established a *prima facie* case of retaliation with respect to the non-renewal of her administrative contract and the two months for which she received delayed payment,[12] there is still ample evidence these things would have happened absent any protected speech in which Plaintiff may have participated.  Plaintiff was placed on administrative leave pending an investigation into allegations of potential fraud and misconduct.  The notice indicating Defendants were considering not renewing Plaintiff's administrative contract informed her that it was because she had "fail[ed] to properly safeguard District resources after being put on notice of potentially fraudulent activity." Plaintiff had the opportunity to dispute the nonrenewal during the April 28, 2021 AABOE meeting.  She was represented by counsel and proffered several reasons why her culpability in Johnson's actions was mitigated.  However, she admitted that 1) Brown told her during the 2015–2016 school year that Johnson was claiming excess time, 2) as principal, she had ultimate responsibility over Lawton's budget,

---

[12] *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 232 (6th Cir. 2005) (finding nonrenewal of a high school teacher's contract was an adverse action for purposes of a First Amendment retaliation claim); *Leary*, 228 F.3d at 738 (noting that an involuntary transfer of teachers qualifies as an adverse action under First Amendment retaliation analysis).

and 3) she signed and approved several timesheets on which Johnson had claimed excess time.  After Plaintiff's presentation, the AABOE Trustees unanimously voted not to renew her administrative contract.  Furthermore, Plaintiff was not initially paid for the two months while she was between positions due to a clerical error and Defendants have since rectified the issue by giving her backpay.  Under these circumstances, no rational trier of fact could find that any protected speech in which Plaintiff may have engaged was the but-for cause of her contract nonrenewal or the missing two months' payment.  *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399–400 (6th Cir. 2010) (When assessing motive in the context of a summary judgment motion, "[b]are allegations of malice [do] not suffice to establish a constitutional claim." (second alteration in original) (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588 (1998)); *see also Hartwell v. Houghton Lake Cmty. Sch.*, 755 F. App'x 474, 480 (6th Cir. 2018) ("The Constitution is not a shield for bad behavior in the workplace.").

Accordingly, the Court holds that the Individual Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

### 3.  Freedom of Association (Count IV)

The United States Constitution protects two different types of "freedom of association:" a right of intimate association and a right of expressive association. *Roberts*, 468 U.S. 609, 617–18 (1984).  The freedom of intimate association protects

56

the "choice[] to enter into and maintain certain intimate human relationships" free from "undue intrusion by the State" while the freedom of expressive association protects the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.*

Count IV of the Amended Complaint refers only to the freedom of expressive association. *See* ECF No. 14, PageID.124 ("Ms. Blick's aforementioned rights to attend school board meetings and voice her opinions on matters of public concern on public property and to speak freely with members of the AAPSD community is constitutionally protected."). The Sixth Circuit has long held that "[s]tate employee's freedom of expressive association claims are analyzed under the same standard as state employees' freedom of speech claims." *Akers v. McGinnis*, 352 F.3d 1030, 1036 (6th Cir. 2003) (citing *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir.1985)); *see also Baar*, 311 F. App'x at 822.

In support of her expressive association claim, Plaintiff asserts that Defendants restricted her from attending the May 8, 2019 AABOE meeting and discussing matters of public concern involving Lawton education and student issues with parents, students, and teachers. ECF No. 64, PageID.1883. As discussed in Section III, Subsection B, Part 1 *supra*, it is not clear that Defendants, in fact, prohibited Plaintiff from attending the May 8, 2019 AABOE meeting, as opposed to

57

merely encouraged her not to attend it.  Yet, viewing the facts and making inferences in the light most favorable to the nonmovant, *Anderson*, 477 U.S. at 255, the Court will assume *arguendo* that Defendants did restrain Plaintiff from attending the meeting to discuss her placement on administrative leave or the investigation into the potential misappropriation of public funds.  The Court also assumes *arguendo* that the "Lawton Community" is the type of "group" entitled to protection under an expressive association claim.  *See Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010).

Nevertheless, for the reasons discussed in Section III, Subsection B, Part 1, subpart iii *supra*, Defendants' interests in conducting their internal investigation without interference and operating Lawton without disruptions outweighed Plaintiff's interest in discussing her placement on administrative leave or the investigation either at the May 8, 2019 AABOE meeting or with unidentified Lawton students, parents, and staff.  To the extent Plaintiff argues she was restricted from associating with Lawton students, parents, and staff regarding issues unrelated to her leave or the investigation, such assertions are belied by the record.  For example, in her May 8, 2019 email to Plaintiff, Cooke, a Lawton teacher and Plaintiff's friend, explicitly noted that she "had heard from Dawn Linden that communication with [Plaintiff] was acceptable when it involved her children."  ECF No. 61-40, PageID.1801.  More importantly, such associations would not involve activities

58

usually protected by the First Amendment and are thus not protected by the freedom of expressive association. *See Roberts*, 468 U.S. at 618; *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (noting that opportunities to meet people of different ages in dancehalls "might be described as 'associational' in common parlance, but they simply do not involve the sort of expressive association that the First Amendment has been held to protect.").

Additionally, although she does not allege a right to intimate association in Count IV of her Amended Complaint, Plaintiff contends that the evidence establishes that Defendants interfered with her right to intimate association by restricting her access to her children. *See* ECF No. 64, PageID.1882. Plaintiff cannot, in response to a motion for summary judgment, assert a claim that she failed to allege in her Complaint or Amended Complaint. *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 787-89 (6th Cir. 2005) (affirming district court's refusal to consider claim asserted for the first time in response to a motion for summary judgment because the plaintiff failed to plead the claim and the defendants did not have notice of the claim (citations omitted)). Thus, Plaintiff's freedom of intimate association claim fails because she never presented it prior to her response to Defendants' Motion for Summary Judgment.[13]

_____

[13] The Court also notes that the Sixth Circuit has clarified that freedom of intimate association claims are properly brought under the Fourteenth Amendment, not the

Nevertheless, the Court notes that Defendants would be entitled to summary judgment on the merits of the intimate association claim as well. "Government action that has a 'direct and substantial influence' on intimate association receives heightened review." *Beecham v. Henderson Cnty., Tennessee*, 422 F.3d 372, 376 (6th Cir. 2005) (quoting *Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir. 2004)). However, government action is deemed to have "direct and substantial burdens" on intimate association

> only where a large portion of those affected by the rule are absolutely or largely prevented from [forming intimate associations], or where those affected by the rule are absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations].

*Id.* (quoting *Anderson*, 371 F.3d at 882). Lesser interferences on the right to intimate association are subject to rational basis review. *Hartwell v. Houghton Lake Cmty. Sch.*, No. 17-CV-10678, 2018 WL 925848, at *10 (E.D. Mich. Feb. 16, 2018) (citations and internal quotation marks omitted), *aff'd on other grounds*, 755 F.

---

First Amendment. *Hartwell*, 755 F. App'x at 478. Plaintiff is thus asserting her claim under the wrong constitutional provision. *See Akers*, 352 F.3d at 1035 ("The plaintiff's claims of constitutional violation are based upon two analytically distinct forms of freedom of association: freedom of intimate association, protected under the Substantive Due Process component of the Fourteenth Amendment, and freedom of expressive association, protected under the Freedom of Speech Clause of the First Amendment.").

App'x 474 (6th Cir. 2018).  Rational basis review is "satisfied so long as there is a plausible policy reason for the government action, irrespective of whether that reason actually motivated the decision maker."  *Id*.

Plaintiff provides the following examples of Defendants restricting her from associating with her children: she was unable to attend the choir concert on April 26, 2019, attend the fifth-grade graduation ceremony, continue as the head coach of her children's soccer team, serve as a room parent in Wesley's classroom, administer allergy medication to her son at school, or attend to her children at Lawton without notice and permission.   ECF No. 64, PageID.1883.   These constitute lesser interferences with Plaintiff's right to intimately associate with her children as even Plaintiff testified that she was still able to attend several events for her children (and Plaintiff was still able to associate with them outside of Lawton).  *See* ECF No. 61-5, PageID.1344 ("Then after [May 2019], I began to do more parental things that I knew I had a right to do."); ECF No. 25-2, PageID.664 (stating Defendants "forbid [Plaintiff] to appear on Lawton premises, except for attending to [her] three children that attend Lawton").

The Court finds that there are plausible policy reasons for each of the examples Plaintiff provides.  Notably, Plaintiff does not allege, nor is there any evidence in the record to establish, that Defendants explicitly prohibited her from attending the concert on April 26, 2019—the day that she was placed on

administrative leave.  Even if they had, it would be rational to stop Plaintiff from attending Lawton events until her administrative leave was communicated to the community in early May.  Next, while Plaintiff was not permitted to serve as a room parent, she was permitted to attend any class parties as long as she did not do so in a leadership capacity.  Again, it was rational to restrict Plaintiff, who was still on administrative leave pending an investigation into potential fraud and misconduct not to hold any leadership positions during the pendency of the investigation. Moreover, while Plaintiff had to seek permission to enter the Lawton campus, this seems to be consistent with the increased security measures that were instituted during the 2019–2020 school year.  Even if the restriction was solely directed at Plaintiff, it is rational for Defendants to be aware of when and why Plaintiff entered the premises given their interest in minimizing the chances that Plaintiff could interact with witnesses in the ongoing investigation.

Although Plaintiff tries to frame them differently, on the evidence before the Court, the other examples are of broad policies that were applied to Plaintiff as opposed to her being singled out.  The music director asked parents of students in the choir not to attend the fifth-grade graduation ceremony to ensure there was enough space for families of fifth graders.  Additionally, Plaintiff was not permitted to be the head soccer coach because she failed to fill out the paperwork for the position by the deadline.  She was, however, able to serve as the assistant soccer

coach and as the head coach for the basketball team. Lastly, AAPSD Administrative Regulation 5600.R.01 mandates that all medication must be administered by the school nurse or a trained administrator and must be accompanied by a prescription. As such, Defendants' interferences with Plaintiff's right to intimate association with her children pass rational basis review, and Defendants would have been entitled to summary judgment on this claim.

Accordingly, the Court concludes that the Individual Defendants are entitled to summary judgment on Plaintiff's freedom of association claim(s).

### 4. Official capacity claims

Local governments cannot be sued under § 1983 based solely on injuries inflicted by their employees or agents. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *see also Vereecke*, 609 F.3d at 403. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. A plaintiff can make this showing in four ways: "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Winkler v. Madison Cnty.*, 893 F.3d 877, 901 (6th Cir. 2018) (citation omitted).

Here, Plaintiff asserts that the "AAPSD and AABOE maintained and tolerated municipal policies and customs of putting administrators and employees on administrative leave as a pretext to deprive them of their constitutional rights while AAPSD and AABOE conducted sham investigations." ECF No. 64, PageID.1886. She also asserts that "these policies were acted on and enforced by Swift, Langford and Linden, who were officials of AAPSD and AABOE who had decision making authority on behalf of AAPSD and AABOE." *Id.* at PageID.1887.

To the extent Plaintiff intends to establish municipal liability through the actions of officials with final decision-making authority, her claims must fail. For all the reasons discussed in Section III, Subsection B, Parts 1, 2, and 3 *supra*, the Court has determined that the Individual Defendants did not violate Plaintiff's First (or Fourteenth) Amendment rights, so Plaintiff cannot rely on their conduct to establish municipal liability. *See Vereecke*, 609 F.3d at 404 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

Likewise, to the extent Plaintiff seeks to establish municipal liability through a custom-of-tolerance theory, her claims must also fail. "A 'custom' must 'be so permanent and well settled as to constitute a custom or usage with the force of law.'" *Vereecke*, 609 F.3d at 403 (quoting *Monell*, 436 U.S. at 691). Thus, "a custom-of-tolerance claim requires a showing that there was a pattern" of "similar"

64

constitutional violations.  *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013);

*Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005).

Here, other than conclusory allegations and her own placement on administrative leave, Plaintiff provides only one example of another administrator being subjected to a "sham investigation" and placed on administrative leave: former Slauson Middle School Principal Rick Weiler.  ECF No. 64-2, PageID.1902–03. However, Weiler affirmed that he "voluntarily retired as the Principal of Slauson Middle School" and during his employment with the AAPSD, he "ha[d] never been placed on paid administrative leave."  ECF No. 67-8, PageID.3038.  Thus, there is only one example of the allegedly unconstitutional policy in the record before the Court.  Plaintiff cannot "infer a [district]-wide policy based solely on one instance of potential misconduct."  *Thomas*, 398 F.3d at 432 (citing *Monell*, 436 U.S. at 694). Indeed, it is not clear that she could establish a custom-of-tolerance claim with even two examples.  *See Beard v. Whitmore Lake Sch. Dist.*, 244 F. App'x 607, 613 n.3 (6th Cir. 2007) ("Two incidents of unconstitutional [conduct] over the course of five months, does not demonstrate behavior 'so permanent and well settled as to constitute a custom or usage with the force of law.'" (quoting *Monell*, 436 U.S. at 691)).

Lastly, Plaintiff makes passing reference to the AAPSD and AABOE's failure to train or supervise their employees.  *See* ECF No. 64, PageID.1888.  This too is

insufficient.  To establish municipal liability for failure to train, "a plaintiff 'must establish that: 1) the [municipal defendant]'s training program was inadequate for the tasks that [employees] must perform; 2) the inadequacy was the result of the [municipal defendant]'s deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury.'"  *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006).  Here, Plaintiff makes no allegations and has presented no evidence regarding the training the AAPSD and AABOE give to employees.  *See generally* ECF Nos. 14, 64.  *Cf. Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (to establish a claim for failure to train or supervise, the plaintiff must "*show* a policy of inadequate training or supervision") (emphasis added).  Thus, the Court cannot know whether the Defendants' alleged "shortcomings may have resulted from factors other than a faulty training program."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390–91 (1989).

Accordingly, the Court concludes that the AAPSD and AABOE are entitled to summary judgment on Plaintiff's municipal liability claims.

### 5.  Attorneys' Fees and Costs

Finally, Defendants argue they are "entitled to an award of attorneys' fees and costs under 42 U.S.C. § 1988, and 2000e-(5)k; 28 U.S.C. § 1927 against Plaintiff and/or her counsel for filing and pursuing vexatious and non-meritorious claims and

for counsel's uncivil behavior throughout this litigation, which needlessly obstructed and interfered with the litigation."  ECF No. 61, PageID.1207.

As Judge Dawkins Davis explained:

> The award of fees to a prevailing defendant is entrusted to the court's sound discretion, but "[a]n award of attorney's fees against a losing plaintiff in a civil rights action is an extreme sanction, and must be limited to truly egregious cases of misconduct."  *Jones v. Cont'l. Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986) (citing *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 422 (1978)).  As the Supreme Court explained in *Christiansburg*:

> > *In applying these criteria, it is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation.  This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.*  No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable.  Decisive facts may not emerge until discovery or trial.  The law may change or clarify in the midst of litigation.  Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

> > . . . Hence, a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.

67

434 U.S. at 421 (emphasis added).  In accordance with *Christiansburg,* the Sixth Circuit allows an award of attorney fees "to a prevailing defendant in civil rights action only 'upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'"  *Baker v. Windsor Republic Doors*, 414 F. App'x. 764, 780 (6th Cir.2011) (quoting *Christiansburg*, 434 U.S. at 421).  Attorney's fees and costs are available to defendants in § 1983 cases under the same standards applicable to Title VII cases. *See Hughes v. Rowe*, 449 U.S. 5, 14–15 (1980).

Application of these standards requires inquiry into the plaintiff's basis for suing.  *Smith v. Smythe-Cramer Co.*, 754 F.2d 180, 183 (6th Cir. 1985).  Awards to prevailing defendants will depend on the factual circumstances of each case.  *Id*.  "[W]here no evidence supports the plaintiff's position or the defects in the suit are of such magnitude that the plaintiff's ultimate failure is clearly apparent from the beginning or at some significant point in the proceedings after which the plaintiff continues to litigate."  *Id*.

ECF No. 31, PageID.814–16.

The Court acknowledges that most of Plaintiff's claims were dismissed at the motion to dismiss stage for failure to state a claim or voluntarily dismissed after Defendants' Motion for More Definite Statement (ECF No. 32).  *See* ECF Nos. 31, 36.  The Court also acknowledges that it is granting summary judgment on the remainder of Plaintiff's claims in this Opinion and Order.  Nevertheless, the Court cannot conclude that Plaintiff's action "was frivolous, unreasonable, or without foundation.'"  *Baker*, 414 F. App'x. at 780 (quoting *Christiansburg*, 434 U.S. at

68

421).   Indeed, this Opinion and Order would not be nearly so long if Plaintiff's claims were completely without merit.   To the extent Defendants argue they are entitled to attorneys' fees and costs based on Plaintiff's counsel's conduct, the Court is unpersuaded.   The deposition transcripts in this matter revealed a lack of professionalism and civility on both sides, and the Court will not sanction one party when both appear to be at fault.   Nor were there, to the Court's knowledge, discovery abuses or other dilatory tactics sufficient to award sanctions.   Thus, Defendants' request is denied.

## IV.   CONCLUSION

Accordingly, for the reasons articulated above, **IT IS HEREBY ORDERED** that Defendants Motion for Summary Judgment (ECF No. 61) is **GRANTED IN PART AND DENIED IN PART**.   Specifically, summary judgment is **GRANTED** with respect to Plaintiff's freedom of speech claims (Count II) and her freedom of associations claim(s) (Count IV) but **DENIED** with respect to Defendants' request for attorneys' fees and costs.

**IT IS SO ORDERED**.

/s/ Gershwin Drain_____
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated:  May 26, 2023


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 26, 2023, by electronic and/or ordinary mail.
/s/ Amanda Chubb for Teresa McGovern
Case Manager

70